# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 17, 2014

## STATE OF TENNESSEE v. EMONNIE DION BRANCH, JR.

**Direct Appeal from the Criminal Court for Sumner County**
**Nos. CR-879-2012, CR-852-2012      Dee David Gay, Judge**

**No. M2013-01843-CCA-R3-CD - Filed November 6, 2014**

The appellant, Emonnie Dion Branch, Jr., pled guilty in the Sumner County Criminal Court to twenty-three offenses resulting from two home invasions, two convenience store robberies, and an assault of a fellow inmate. The trial court imposed a total effective sentence of one hundred and thirty years. On appeal, the appellant challenges the length of the sentences imposed by the trial court. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROGER A. PAGE, J., joined. JERRY L. SMITH, J., not participating.

James J. Ramsey, Gallatin, Tennessee (on appeal); and Gary M. Williams, Hendersonville, Tennessee (at trial), for the appellant, Emonnie Dion Branch, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Lytle Anthony James and Tara Wyllie, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

On June 10, 2013, the appellant pled guilty to aggravated burglary of A.H.[1] and B.H.'s residence in Castalian Springs and aggravated robbery and especially aggravated kidnapping of B.H. Regarding A.H., the appellant pled guilty to especially aggravated kidnapping,

---

[1]It is the policy of this court to refer to victims of sexual offenses by their initials.

aggravated robbery, and three counts of aggravated rape. For offenses related to four victims at a home in Gallatin, the appellant pled guilty to especially aggravated kidnapping, aggravated robbery, aggravated rape and attempted aggravated rape of E.V.; aggravated burglary of P.B.'s residence; especially aggravated kidnapping and aggravated robbery of P.B.; especially aggravated kidnapping and aggravated robbery of Britten Dale Galbraith; and especially aggravated kidnapping and aggravated robbery of Billy G. Phillips. The appellant also pled guilty to aggravated robbery of Mohamed A. Alassar; aggravated robbery of Mohamed A. Alezab; and aggravated robbery of Dhrupad J. Patel. Finally, the appellant pled guilty to aggravated assault of inmate Joseph C. McDorman, III.

At the sentencing hearing, Sumner County Detective Ronald Brawner testified that at 11:03 p.m. on June 12, 2012, the sheriff's office received a report of a burglary, robbery, and rape in Castalian Springs. Detective Brawner's investigation revealed that the rape victim, A.H.; her husband, B.H.; and their two children lived in a rented house on Harsh Lane. At approximately 10:30 p.m., after all the occupants of the house had gone to bed, A.H. and B.H. heard a noise. A few minutes later, two men, one of whom was the appellant, rushed into their bedroom; the appellant was holding a weapon that appeared to be a handgun. B.H. was forced from the bed, pushed to the floor, and tied up. The appellant took A.H. to the bathroom and repeatedly raped her. The rapes occurred by oral, vaginal, and anal penetration. The men took property from the residence, including televisions, electronics, and the victims' wedding rings. After the men left, the victims called 911. A.H. was later taken to Sumner Regional Hospital, and a rape kit was performed. Afterward, Detective Brawner collected the rape kit and took it to the Tennessee Bureau of Investigation crime laboratory. Testing revealed that the appellant was the contributor of the semen collected from A.H.

Detective Brawner said that based upon his investigation, the appellant appeared to be the leader in the commission of the offenses. He said that on June 15, he learned that a similar incident had taken place in Gallatin.

On cross-examination, Detective Brawner acknowledged that the victims' two children, who were in the house at the time of the offenses, were not harmed. He noted that the appellant made A.H. "open the bedroom door and they looked in and saw that there were children there." Detective Brawner said that B.H. was kicked while he was on the floor.

On redirect, Detective Brawner said that although the children were not injured, "there were threats made if [the victims] didn't cooperate about what would happen to the children."

Upon questioning by the trial court, Detective Brawner said that a co-defendant,

Mitchell Anthony Beverly, Jr., admitted that he and the appellant had discussed committing a robbery. Beverly had a key to the deadbolt on the back door of the victims' home on Harsh Lane, where he had lived with his mother and stepfather. Beverly told Detective Brawner that he stayed in the vehicle and acted as a lookout and a getaway driver while the appellant and another co-defendant, Dewayne D. Fleming, used Beverly's key to gain entrance into the home.

Detective Brawner said that the appellant ordered Fleming to tie up B.H. Fleming complied, using a bed sheet. The appellant did not think the knots were secure, and he retied B.H. In A.H.'s statement to police, she revealed that as the appellant was raping her in the bathroom, Fleming asked the appellant for assistance in removing items from the home. Detective Brawner stated that he found no evidence that Fleming participated in the sexual assaults on A.H. or that he had a weapon. The investigation revealed that the appellant possessed the sole weapon, a handgun, used during the crimes.

Gallatin Police Investigator Christian Booth testified that around midnight on July 15, 2012, he was called to a house on Jill Street to investigate a report of a home invasion. Through his investigation, he learned that there were two perpetrators: one was a black male, the other was a white male. The police later learned that the appellant was the black male and that Beverly was the white male. Four adults and three juveniles were in the home at the time of the offenses. An adult female, E.V., who was raped by one of the suspects, was transported to Sumner Regional Hospital.

Investigator Booth said his investigation revealed that the appellant had knocked on the door of the residence and that P.B. answered the door. The appellant forced his way inside, pointed a semi-automatic handgun at P.B.'s head, and ordered the four adults to lie on the floor. Beverly then entered the residence carrying a baseball bat. The two men ordered the victims to stay on the floor with their faces down and to not look at the suspects. The men ransacked the house, removing several items. They also asked about a .380 pistol and an outlet wall safe.

Investigator Booth said that during the robbery, the appellant ordered E.V. to walk into the bedroom. He handed his gun to Beverly then followed E.V. Once in the bedroom, the appellant told her to remove her clothes. When she started to cry, he "told her to be quiet or her daughter was next." E.V. removed her shirt, pants, and panties but did not remove her undershirt and bra. The appellant ordered her to lie on the bed and spread her legs. When she complied, he put on a condom and penetrated her vaginally. As E.V.'s cries became louder, the appellant put a pillow over her face. E.V. was able to turn her head to the side, and she saw tattoos on the appellant's right forearm and biceps as well as his lower abdomen. During the rape, the appellant repeatedly ordered her to "pull her breasts out." Shortly after

she complied, he forced her to turn over and attempted to penetrate her anus. E.V., who had a history of seizures, began to shake. The appellant stopped trying to penetrate her anus and instead "thrust himself between her legs." The assault stopped "[m]inutes later." E.V. lay on the bed in a fetal position, and the appellant left the room. At some point, one of the perpetrators threw a blanket over her, asked if she was still alive, and continued to ransack the room. After the perpetrators left, the victims called 911.

Investigator Booth said that during his interview with E.V., she mentioned Fleming's name. The police found Fleming, but he did not have any tattoos on his stomach. During a search of Fleming's residence, the police discovered several of the items that had been taken during the Harsh Lane and the Jill Street crimes. In a nearby yard, the police found a "black BB gun semi-automatic pistol." Other items from the Harsh Lane robbery had been pawned at a local pawn shop, and Beverly's name was on the pawn slip.

Investigator Booth said that the police tracked Beverly's cellular telephone and conducted a traffic stop of the vehicle. Beverly was driving, and the appellant was in the passenger seat. A black semi-automatic BB gun was found in the vehicle. The men were taken into custody and transported to the police station. During an interview, Beverly confessed that he had participated in the Harsh Lane and Jill Street crimes. He said that he stayed in the car while the appellant and Fleming went inside the home on Harsh Lane. Regarding the Jill Street incident, Beverly stated that he was armed with a baseball bat, and the appellant had a pistol. When P.B. answered the door, the appellant put a gun to her head and ordered everyone to lie on the floor. Fleming had told the appellant and Beverly that E.V. had a .380 pistol and an outlet box safe. Beverly said that he and the appellant ransacked the house and took various items. During the robbery, the appellant handed his gun to Beverly. As the appellant walked into the bedroom with E.V., he told Beverly to "'[w]atch this.'" At that point, Beverly realized the appellant intended to rape E.V. Beverly kept a gun on the other occupants of the home while the appellant raped E.V. Beverly also said that on June 17, he acted as a lookout while the appellant robbed the cashier and clerk of the New Shackle Island Market in Hendersonville.

Investigator Booth said that the appellant was arrested on June 19. While at the police station, a photograph was taken of a tattoo on the appellant's lower abdomen. The words "Enjoy the Ride" were written above an arrow that pointed toward the appellant's genital area.

Investigator Booth said that all of the victims said that the appellant ordered Beverly around and that the appellant seemed to be in charge. The appellant also "made statements that – about this not being his first time."

-4-

Hendersonville Police Detective Jim Bachman testified that he was involved in investigating an aggravated robbery at the New Shackle Island Market on June 17, 2012. The investigation revealed that the appellant and Beverly waited in a tree line near the market until it closed. Around 11:00 p.m., the employees, Mohamed Alassar and Mohamed Alezab, left for the night. The appellant and Beverly, who were wearing bandanas to cover their faces, approached the men, pointed pistols at them, and ordered them to hand over their wallets and cellular telephones. The victims had no money, so the perpetrators ordered them to unlock the store, go inside, and retrieve the money from the cash register.

Detective Bachman said that on June 19, Investigator Booth notified him that Beverly had confessed to participating in the robbery at the New Shackle Island Market. Detective Bachman interviewed Beverly, and he admitted that he and the appellant had committed the robbery. Detective Bachman said his investigation revealed that the appellant was the leader in the offense.

Henderson Police Detective Seneca Smith testified that on June 1, 2012, the appellant was involved in an armed robbery at the Stop Food Mart on Sanders Ferry Road in Hendersonville. The appellant was wearing a mask to cover his face, and his hands were also covered. Dhrupad Patel, the clerk, told Detective Smith that the appellant jumped over the counter, pointed a gun at him, and ordered him to put the money from the cash register and cigarettes in a bag. At a preliminary hearing, the appellant admitted committing the robbery.

A.H. testified that the transcripts of the preliminary hearing and her victim impact statement sufficiently summarized the facts of the offenses.[2] She stated that she was thirty-seven years old, which she noted was the same age as the appellant's mother. She asked the appellant, "Can you imagine your mother being raped at gunpoint by a teenage boy?"

P.B. testified that her daughter, E.V., would be tormented by the rape for the rest of her life. P.B. said that she was also traumatized by being forced to lie on the floor with a gun pointed at her, hearing the appellant rape her daughter, and being unable to come to her defense. Her three grandchildren were at the home at the time of the offenses. She told the appellant, "I don't understand how you could go into my kitchen and get a bottle of wine and kick your feet up on our coffee table and want a conversation after you've raped my daughter."

Defense counsel advised the court that the appellant did not want to submit proof or

---

[2]The trial court stated that it would consider the testimony at the preliminary hearing, the presentence report, the victim impact statements, and the testimony at the sentencing hearing when imposing the sentences.

make a statement.

The trial court imposed sentences of six years for each aggravated burglary conviction and the aggravated assault conviction; twenty-five years for each especially aggravated kidnapping conviction and each aggravated rape conviction; and twelve years for each aggravated robbery conviction and the attempted aggravated rape conviction. The court ordered a combination of concurrent and consecutive sentencing, resulting in a total effective sentence of one hundred and thirty years.

On appeal, the appellant challenges the sentences imposed by the trial court.

## II. Analysis

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be

adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant challenges the trial court's application of enhancement factor (2), that the appellant was a leader in the commission of an offense involving two or more criminal actors, to every conviction except the aggravated robbery of Patel and the aggravated assault of McDorman. The appellant contends that nothing in the record corroborates Detective Bachman's testimony that the appellant was a leader in the commission of the offenses. The appellant maintains that Beverly proposed the robbery and was in charge. The record belies the appellant's contentions. Detectives Brawner and Bachman testified, without objection, that their investigation revealed that the appellant was the leader in the Harsh Street and Jill Street offenses, as well as the New Shackle Island Market robbery. Moreover, at the preliminary hearing, A.H. and E.V. testified that during the offenses, the appellant gave instructions to his co-defendants and that he appeared to be in charge. The "enhancement for being a leader in the commission of an offense does not require that the [appellant] be the sole leader but only that he be 'a' leader." State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). The record supports the trial court's application of enhancement factor (2).

The appellant also challenges the trial court's application of enhancement factor (3), that the offense involved more than one (1) victim, to every conviction except the aggravated robbery of Patel and the aggravated assault of McDorman. Our supreme court has held that factor (3) is not applicable to a charge that is necessarily limited to a specific, named victim. See State v. Imfeld, 70 S.W.3d 698, 705-06 (Tenn. 2002). Because there was a named victim in each offense that the appellant challenges, we agree that the trial court improperly applied enhancement factor (3).

Regarding the application of enhancement factor (5), that the appellant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense, to the convictions of the especially aggravated kidnappings of B.H. and P.B., the aggravated rapes of A.H. and E.V., and the attempted aggravated rape of E.V., the appellant complains that the record contains no proof that the appellant acted with cruelty beyond that which was necessary to accomplish the crimes.

In order to justify the application of enhancement factor (5), the trial court must find "cruelty under the statute 'over and above' what is required to sustain a conviction for an offense." State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)). The "evidence must denote[ ] the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." Id. (Internal quotations and citation omitted). For example, this court has upheld the application of enhancement factor (5) based on evidence of extensive physical abuse or torture or when the record contains proof of psychological abuse or torture. Id.

The trial court found that the appellant acted with exceptional cruelty "in the aggravated rapes and the attempted aggravated rapes, and the especially aggravated kidnapping where the husband was in the next room and where the mother was in the same vicinity of [E.V.] when she was raped." The record reflects that at the Harsh Lane location, A.H.'s husband was nearby when the appellant repeatedly raped A.H. and that the appellant continuously taunted A.H. and B.H. with crude comments about A.H. Additionally, at the Jill Street location, the appellant raped E.V. while her mother and daughter were nearby. The appellant told Beverly to watch as he raped one of the women. The appellant also threatened to rape E.V.'s six-year-old daughter if E.V. did not cooperate. We conclude that the trial court did not abuse its discretion in applying enhancement factor (5).

The appellant questions the trial court's application of enhancement factor (7), that the offense involved a victim and was committed to gratify the appellant's desire for pleasure or excitement, to the convictions of aggravated rape and attempted aggravated rape. The appellant contends that the trial court's application of enhancement factor (7) was based primarily on the tattoo on the appellant's lower abdomen. The appellant contends that the tattoo is not proof of the appellant's motivation for committing the crimes.

Our supreme court has explained that when dealing with the application of enhancement factor (7) to sexual crimes, the trial court must look to the appellant's "*motive* for committing the offense." Arnett, 49 S.W.3d at 261 (emphasis in original). "[P]roper application of factor (7) requires the State to provide . . . objective evidence of the [appellant's] motivation to seek pleasure or excitement through sexual assault." Id. at 262

(citing State v. Kissinger, 922 S.W.2d 482, 490 (Tenn. 1996)). To this end, the court explained that "factor (7) may be applied with evidence including, but not limited to, sexually explicit remarks and overt sexual displays made by the [appellant], such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the [appellant's] enjoyment" of the crime. Id.

In applying factor (7), the trial court said, "I'm not going to get into the psychology of rape, but I do know this. I see this picture here: 'Enjoy the ride.' Sickening; absolutely sickening." We agree with the trial court. Regardless, the record reflects that the tattoo was not the sole basis for the application of enhancement factor (7). E.V. testified at the preliminary hearing that during the rapes, the appellant repeatedly asked her to call him "Daddy," made lewd comments to her and her husband about her sexual performance, and asked if his penis was larger than her husband's. E.V. also testified that during the rapes, the appellant asked her to bare her breasts for him. After unsuccessfully attempting to penetrate her anus, the appellant thrust himself between her tightly-squeezed legs in an effort to ejaculate. We conclude that there is ample proof to support the application of enhancement factor (7).

The appellant also contends that he was only eighteen years old at the time of the offenses; thus, the trial court should have considered mitigating factor (6), that the appellant, because of his youth, lacked substantial judgment in committing the offense. The record reflects that the trial court considered the appellant's youth but gave it little weight.

The appellant also asserts that the trial court failed to consider the appellant's potential for rehabilitation. The record reflects that the trial court considered this factor and found that the appellant showed no potential for rehabilitation. The record supports this finding.

Finally, the appellant contends that the trial court improperly weighed the enhancement and mitigating factors. The weighing of enhancement and mitigating factors is within in the trial court's discretion, and this court is bound by the trial court's decision as long as sentence is imposed in a manner consistent with the purposes and principles of the Sentencing Act. Carter, 254 S.W.3d at 345-46. Because the trial court's imposition of the sentences is consistent with the purposes and principles of the Sentencing Act, the sentences are presumptively correct, and we cannot reweigh the enhancing and mitigating factors. See id. at 344-45.

### III. Conclusion

In sum, we conclude that the trial court properly considered the principles and purposes of sentencing and did not abuse its discretion in sentencing the appellant. Accordingly, we affirm the judgments of the trial court.


_____
NORMA McGEE OGLE, JUDGE